UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-14506-CIV-MAYNARD

CYNTHIA BUCKWALTER,

    Plaintiff,

v.

ANDREW SAUL, Commissioner,
Social Security Administration,

    Defendant.

_____/

## ORDER ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT (DE 16 & 17)

**THIS CAUSE** comes before this Court upon the above Motions. Having reviewed the

Motions, Responses, and Administrative Record (DE 12), and having held a hearing thereon on

September 5, 2019, this Court finds as follows:

## BACKGROUND

1.    The Plaintiff applied for disability insurance benefits under Title II of the Social

Security Act in February 2016. The application was denied initially and after reconsideration. On

December 15, 2017, after holding a hearing, an Administrative Law Judge ("ALJ") rendered a

decision finding the Plaintiff not disabled under the terms of the Act. The Appeals Council

denied the Request for Review on July 17, 2018, thereby leaving the ALJ's decision final and

subject to judicial review.

2.    The Plaintiff has a high school education, and she completed a vocational

program in cosmetology. Her employment history consists mainly of cutting hair and working in

the food service industry. Earnings records show consistent, albeit low, earnings from 2002 to

2013.

3.    The Plaintiff has a criminal history involving mainly domestic violence, alcohol, and drug-related offenses. She has been in jail twice. She was released from the second incarceration in October 2014.

4.    In early November 2014, a month after her release from jail, the Plaintiff was involved in a domestic dispute. She became frustrated with her ex-boyfriend who was refusing to leave the house. She began to feel violent towards him, and she began to feel suicidal, as well. On November 6, 2014 the Sheriff's Office brought her to the Peace River Center for inpatient mental health care under the Baker Act. The Plaintiff complained of anxiety, feeling overwhelmed, drinking too much, and crack cocaine use. She reported a history of manic episodes with adverse consequences. She wanted to resume taking psychotropic medications; she had stopped taking them seven months earlier. Mood disorder and daily crack and alcohol use were diagnosed. A GAF score[1] of 35 was given.

5.    That next day, despite initially conceding the need for both mental health and substance abuse treatment and despite initially being receptive to such help, the Plaintiff asked to be discharged. She now was minimizing the stressors that initially had caused her to seek care. For example she minimized her substance abuse history as just isolated binges.

---

[1] The Global Assessment of Functioning, or "GAF", scale rates a patient's overall psychological, social, and occupational functioning. A GAF score above 60 indicates a mild condition with no significant impairment of work ability. A GAF score of 60 to 51 shows a condition of moderate severity, with a moderate degree of symptoms and a moderate degree of functioning difficulty. A GAF score of 50 to 41 indicates a serious condition that causes serious impairment of social, occupational, or school functioning. See generally, Schink v. Comm'r, 2019 WL 4023639, n.1 (11th Cir. 2019). This Court includes in the case background the GAF scores that the treating providers gave. However the ALJ expressly excluded them from his analysis as the Commissioner directs at 65 Fed.Reg. 50745 (Aug. 21, 2000).

6.     The Peace River Center discharged her from its care on November 7th. Treatment did not end, however. She now was in the court's Triad program and under court order to go for an alcohol evaluation and to resume psychotropic medications. In compliance therewith she began going to the Tri-County Health Human Services clinic on December 17th. At that initial evaluation the Plaintiff complained of poor sleep and paranoia (that her former boyfriend was stalking her). Bipolar Disorder I and alcohol abuse were diagnosed. Her GAF score had increased to 62. That increase from the prior GAF score of 35 reflected the substantial overall improvement that the Plaintiff already experienced after a month of resumed treatment. She would return to the Tri-County clinic on a regular basis thereafter, for the remainder of the record.

7.     The Plaintiff's next appointment at the Tri-County clinic was on January 7, 2015. The Plaintiff sought help reducing her mental health symptoms of insomnia and mania. She also sought help reestablishing sobriety after relapsing over the holiday season. She was to begin group counseling and substance abuse counseling.

8.     The Plaintiff alleges a disability onset date of January 9, 2015. That also is the day when she stopped working. Up until that time she had been working cutting hair. However depression-related problems kept her from staying employed, she reports. She was having difficulty getting out of bed and difficulty with memory and anxiety. She reached the point where she no longer could remember how to cut hair anymore, she alleges.

9.     At the next Tri-County clinic appointment on February 4, 2015, the Plaintiff reported that psychotropic medication was helping and that only lingering depression symptoms remained. She was sleeping well. Upon examination the attendant observed the Plaintiff to have

a somewhat depressed mood and a saddened affect. Her speech was slow, and her insight was limited. Her memory, focus, and concentration were described as sub-optimal.

10.  The Tri-County treatment note from the March 26, 2015 appointment shows continued overall improvement. The Tri-County clinic's treatment notes show that a variety of support programs now were in place to help the Plaintiff maintain sobriety and to help ease other life issues. Vocational Rehabilitation services also had begun.

11.  The Department of Vocational Rehabilitation sent the Plaintiff to Dr. Sassatelli, a psychologist, for a general intellectual and personality evaluation. (His report begins at page 315 of the Administrative Record.) The Plaintiff was 53 years old at the time and had been unemployed for six months due to the emotional disturbances and mood swings of her bipolar disorder, she reported. At the time of the evaluation she reported the depression-related symptoms of helplessness and hopelessness, poor attention and concentration, anhedonia, social withdrawal, and low motivation. Dr. Sassatelli observed the Plaintiff to be mildly anxious, but otherwise her presentation and cognition were normal. Testing suggested a personality type that generally is prone to symptom exaggeration as a cry for help, to personality and mood disorders as well as to substance abuse; and to impulsivity and poor judgment. IQ testing sub-scores fell within the borderline to average range, with a Full Scale IQ score of 79 that fell within the borderline range of 76—83. Dr. Sassatelli diagnosed Bipolar Disorder I, alcohol and cocaine use in sustained remission, personality disorder, and borderline intellectual functioning. Dr. Sassatelli saw need for mental health and substance abuse treatment and the need to stabilize the Plaintiff's mental health condition before she returns to work. "Based on [her] history of emotional disturbances," Dr. Sassatelli encouraged the Plaintiff "to apply for Social Security Disability benefits."

12.    In May 2015 the Plaintiff completed the court-ordered substance abuse program. By time of the July 2015 appointment at the Tri-County clinic, she had been sober for seven months. She looked well, and her mood was stable. The mental status evaluation was overall normal. She was participating in Vocational Rehabilitation. Her health care provider at the Tri-County clinic disagreed with the low IQ rating that Dr. Sassatelli had given. It was inconsistent with the Plaintiff's presentation, vocabulary, and conversation skills that the provider had observed over the course of treatment to-date.

13.    On September 13, 2015 Clint Delong conducted a vocational evaluation to determine what kinds of jobs best fit the Plaintiff's education, work history, interests, aptitude, and personality. Various tests were given as part of that evaluation. The Plaintiff was observed to have poor task completion, and she was quick to abandon tests that she found challenging. The Plaintiff had not yet eaten that day. Mr. Delong observed the Plaintiff to have a tense affect, to be anxious and apprehensive, and to be tenuous and hesitant. Mr. Delong therefore suspected anxiety-related poor focus. Mr. Delong relied on Dr. Sassatelli's prior finding of borderline processing speed. Eye-hand coordination also was below average. The Plaintiff was a poor historian of her employment history. Educational testing was overall normal (that is, consistent with a 12th grade education) except for math skills which were at the 6th grade level. Testing showed her to have the "journalist" type of vocational personality. She no longer could remember how to cut hair, she claimed, but she showed personal interest in food preparation type work.

14.    Mr. Delong concluded that the Plaintiff is employable given reasonable accommodation and support. One such accommodation would be relatively low stress demands. That is, jobs with a manageable work load, pace, deadlines, and personal control. He suggested

that she begin with part-time work first to harden her job skills before progressing to full-time work. Other jobs amenable to the Plaintiff's vocational profile that Mr. Delong identified were sales clerk-type jobs as well as the jobs of stock clerk, courier/messenger, and janitor/cleaner.

15.     The Plaintiff's next appointment at the Tri-County clinic took place two days after the vocational evaluation. The Plaintiff complained of a depressed mood and generalized, passive suicidal ideation. She had found the vocational tests difficult. Despite the Vocational Rehabilitation support services that she was receiving, she did not want to return to work. She preferred to apply for disability benefits. To help with that process, the clinic referred her to Carol Tuck, a "peer specialist".

16.     The Plaintiff was doing much better at the next Tri-County clinic appointment in October 2015. She was doing well on her psychotropic medications. She was not going to therapy, however, because she could not afford it. She had more energy, and she was back in touch with her adult children. She was applying for jobs. The mental status evaluation was normal, and her GAF score was a 64. At her December appointment, the Plaintiff reported continued active participation in vocational rehabilitation including food service training. Her GAF score now was a 69.

17.     At the February 2016 appointment at the Tri-County clinic, the Plaintiff reported medication compliance as well as continued sobriety. Against medical advice, she was maintaining her sobriety on her own without attending AA meetings or seeking equivalent support. She was receiving food service job coaching. The Plaintiff reported cognitive and memory problems that were hindering complex instruction execution. That prompted a diagnosis of a mild neurocognitive disorder from long-term alcohol consumption. Her GAF score remained high at 64.

18.     The Plaintiff applied for disability benefits on February 9, 2016. She was 54 years old at the time. She claimed disability primarily due to Bipolar Disorder and the impairments of poor stress tolerance, memory, and concentration. She also claimed a personality disorder and borderline intellectual functioning.

19.     This is not her first application. She had applied for Social Security disability benefits in September 2008. The basis of that application is unknown. It was denied in January 2009, before the start of the instant record.

20.     Treatment notes from the Tri-County clinic showed that the Plaintiff continued to do well through 2016. She was doing well on her psychotropic medications. She had stopped taking trazodone because she now was sleeping well on her own. She remained sober. She was participating actively in Vocational Rehabilitation job-coaching services. Her GAF scores ranged from 60 to 65. The one medical issue that did arise during this time was the onset of a slight involuntary movement in the perioral area. Congentin medication successfully resolved that condition.

21.     At the February 2017 appointment, the Plaintiff reported that she had stopped taking her psychotropic medications except for Wellbutrin. A program that was paying for those medications had ended, and the Plaintiff did not realize that a particular pharmacy could continue to fill her prescriptions for a modest fee. Up to this point the Plaintiff's memory and cognition had been described as sub-optimal, and at this appointment, the Plaintiff's memory and cognitive issues appeared worse. Her treating provider noted how her medications are of the kind that impair cognitive functions as a side-effect. Therefore the provider switched the Plaintiff to Trintellix which has less of that impairing effect.

22.     Follow-up appointments after the medication change show substantial overall improvement. She now was more active and sociable. Her mood was brighter and still stable with no mania. Her memory, focus, and concentration had improved somewhat although cognitive functions still were described as sub-optimal. Her GAF score remained high at 64.

23.     Medical records show steady improvement since the underlying alcohol-related decompensation episode in November 2014. The improvement was attributed to the ongoing mental health care, sobriety, and support services.

24.     That period of improvement and stability ended in 2017. At the July 18, 2017 appointment at the Tri-County clinic the Plaintiff exhibited signs of intoxication such as slurred speech. When asked about it, the Plaintiff admitted that she had resumed drinking three months prior. She blamed the relapse on the stress that she had felt after her brother moved into the household. The Plaintiff had a depressed mood, and her speech was described as rambling, tangential, and petulant. She had poor hygiene, and her insight and judgment were poor. Her GAF score now was a 38 that reflected the worsening of her overall condition. Up to this point the Plaintiff had resisted AA or related treatment to help her maintain her sobriety. Even now she agreed to enter an inpatient detox center only reluctantly.

25.     The medical record ends with that July 18, 2017 treatment note from the Tri-County clinic. The record contains no medical records from any source thereafter. Thus there are no medical records that confirm that the Plaintiff went to detox as directed and if so that she followed through with substance abuse treatment afterwards. However the record does contain the Plaintiff's handwritten statement, found at page 283 and file-stamped August 21, 2017, where she reports undergoing treatment at the Florida Center for Dual Diagnosis Disorders for bipolar disorder and alcoholism. At page 298 is the Plaintiff's letter dated February 12, 2018 in

which she again asserts undergoing treatment at the center from August to October, 2017. She also reports ongoing treatment with Dr. Huber at the Maxwell Medical Center for bipolar, anxiety, and depression disorders. The Administrative Record does not contain treatment records from those two providers, however, despite the fact that the ALJ gave her leave to submit them.

26.     The Plaintiff's "date last insured", that is, the date when her insurance coverage for Title II disability benefits ended, was September 30, 2017. The Plaintiff therefore must establish that disability began before that date. That makes medical evidence generated after September 30, 2017 less relevant, generally speaking, to the disability determination.

27.     The administrative hearing took place on November 9, 2017. The Plaintiff was 55 years old at the time. The Plaintiff testified that she recently had become sober again after entering the detox program that the Tri-County clinic had required her to do (or else the police would be called). She said she had been drinking for six months up to that point, and she was drinking at the same time as taking her prescription medications. At the hearing she asserted that her medications were not helping to relieve her depression anyway (although the treatment records show to the contrary, this Court notes). She also testified that she now goes to AA meetings and does so on a daily basis.

28.     At the hearing the Plaintiff claimed disability due to depression and anxiety. Although she claimed a diagnosis of Bipolar Disorder, she had not had a manic episode over the prior three years. However it was manic episodes that in the past had interfered with employment and other aspects of her life.

29.     A vocational expert ("VE") also testified at the hearing. The ALJ proposed different hypothetical situations for the VE to consider. For example the ALJ proposed a hypothetical worker who "is able to understand, carry out, and remember simple instructions",

who can "make simple work-related decisions", and who "would be off task 10% of the work day." The VE answered that such a worker could perform the jobs of laundry worker (DOT No. 361.685-018), janitor (DOT No. 381.687-018), and store laborer (DOT No. 922.687-058). Those jobs, the VE furthered, are unskilled and have an SVP of 2. Lastly the VE answered that her testimony is consistent with what the Dictionary of Occupational Titles ("DOT") says.

30.     The ALJ found the Plaintiff to have the "severe impairments" of bipolar disorder, mood disorder not otherwise specified, personality disorder, and borderline intellectual functioning albeit with a full-scale intelligence quotient. Next the ALJ considered the degree of impairment across four domains of functioning. For two of those domains--- information processing and social functioning---the ALJ found a moderate degree of impairment. For the other two---concentration, persistence, and pace and adaptibility/self-management---the ALJ found only a mild degree of impairment. Consequently the ALJ found no extreme or marked degree of impairment needed to support such a finding. Nor did the ALJ find the Plaintiff's condition to meet any of the other measurements of Listing-level severity. The Plaintiff's full score IQ of 79 was above the 75 threshold, and the Plaintiff did not need a highly structured living environment, for example.

31.     The ALJ reviewed the Plaintiff's medical history, noting overall improvement albeit with some fluctuation over the course of treatment. The ALJ noted the Plaintiff's good response to medication, increased activity including job searches, but also consistently suboptimal memory, focus, and concentration. The ALJ noted Dr. Sassatelli's report, giving it "some" evidentiary weight noting the lack of specifically articulated work-setting limitations. Likewise the ALJ gave just "some" evidentiary weight to the vocational report that Mr. Delong had written. The ALJ said Mr. Delong gave no specific work-setting limitations (However the

ALJ also construed Mr. Delong's report as indicating the Plaintiff's ability to do unskilled work.) In comparison the ALJ gave great weight to the RFC ratings of the two non-examining agency advisors, Dr. Jackson and Dr. Pack.

32.     The ALJ found the Plaintiff's drug and alcohol abuse to be in remission. Therefore the ALJ found it to be non-severe and no longer the cause of significant impairment of basic work functions. Because of the Plaintiff's abstinence, the ALJ excluded it as "a factor material to the determination of disability."

33.     In assessing the Plaintiff's Residual Functional Capacity ("RFC"), the ALJ found her able to understand, carry out, and remember simple instructions; make simple work-related decisions, deal with supervisors, co-workers, and the public on an occasional basis, and be off-task 10 percent of the workday. In other words the ALJ made substantial accommodation for mental work-related impairment.

34.     That RFC does not permit the Plaintiff to perform her past work as a hair stylist which the DOT classifies as skilled work, the ALJ found. The ALJ therefore proceeded to determine the availability of jobs that are amenable to the Plaintiff's RFC and vocational profile. Citing the testimony of the Vocational Expert who also testified at the hearing, the ALJ found that the Plaintiff could perform the jobs of laundry worker, janitor, and store laborer. The ALJ therefore concluded that the Plaintiff is not disabled as that term is defined by the Social Security Act.

## DISCUSSION

35.     Judicial review of the Commissioner's decision is limited to a determination of whether it is supported by competent, substantial evidence and whether the proper legal standards were applied. See Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997). Substantial

evidence is such relevant evidence that a reasonable person might accept as adequate to support the conclusion reached. If the decision is supported by competent, substantial evidence from the record as a whole, a court will not disturb that decision. A court may not re-weigh the evidence or substitute its judgment for that of the ALJ. See Schink v. Comm'r, 2019 WL 4023639, *6 (11th Cir. 2019). While the Commissioner's fact findings enjoy deference, a court is free to review the Commissioner's legal analysis and conclusions de novo. See Ingram v. Comm'r, 496 F.3d 1253, 1260 (11th Cir. 2007). See generally, Washington v. Comm'r, 906 F.3d 1353, 1358 (11th Cir. 2018) (stating the general rule that the court will affirm the Commissioner's decision if substantial evidence supports it and if the Commissioner applied the correct legal standards).

### (1)  Whether the ALJ Erred by Finding a Mild, rather than Moderate, Degree of Concentration Impairment.

36.     The Plaintiff objects to the ALJ's Step Two analysis, or more specifically, the Psychiatric Review Technique ("PRT") inquiry that the ALJ undertook as part of the Step Two analysis. Title 20 C.F.R. § 404.1520a sets forth the PRT inquiry standard. Subsection (c)(3) thereof lists the four domains of mental functioning: (1) to understand, remember, or apply information; (2) to interact with others; (3) to maintain concentration, persistence, or pace; and (4) to adapt and to manage oneself. These domains are defined at § 12.00E of the Listings of Impairments in Appendix 1 to 20 C.F.R. § 404.1520a. They are also referred to as the "paragraph B" criteria.

37.     Regarding the third domain---concentration, persistence, and pace---the ALJ found the Plaintiff to have a mild degree of impairment. The Plaintiff argues that the ALJ erred by understating the degree of impairment. The Plaintiff points to the two non-examining agency medical advisors, Dr. Jackson and Dr. Pack, who rated the Plaintiff as moderately impaired in

that domain. Because the ALJ gave the medical advisors' RFC rating reports great weight generally, the ALJ should have followed their lead and found her to be moderately impaired in that specific domain, too, she reasons. This Court disagrees with the Plaintiff's reasoning and finds no reversible error in the ALJ's finding of a mild impairment of third domain (concentration, persistence, and pace) functioning.

38.    For the PRT analysis at Step Two, the ALJ cited evidence that supports the Plaintiff's claim of concentration-related impairment. For example the ALJ noted the Tri-County treatment notes' overall consistent description of the Plaintiff's concentration as suboptimal. Conversely the ALJ cited evidence that suggests normal or minimally impaired concentration. The ALJ resolved that evidentiary conflict by finding a mild degree of impairment. The one item of evidence that the ALJ did not include in the PRT analysis at Step Two, this Court notes, was the advisory RFC ratings by Dr. Jackson and Dr. Pack. Their advisory RFC ratings (either generally or with respect to the Plaintiff's concentration specifically) played no express role in the ALJ's finding of a mild concentration-related impairment.

39.    Step Two of the disability analysis is a threshold level of inquiry. See Schink, 2019 WL 4023639 at *12—13. The more involved inquiry is Step Four where a claimant's RFC is assessed. See SSR 96-8p. While the PRT is generally relevant to the later RFC assessment and vocational analysis at Steps Four and Five, see Winschel v. Comm'r, 631 F.3d 1176, 1180—81 (11th Cir. 2011), the Step Four RFC assessment is more comprehensive and draws from the whole record, see Schink, 2019 WL 4023639 at *16. The ALJ expressly acknowledged that where, at page 29 of the Administrative Record, he explained how:

> the limitations identified in the "paragraph B" criteria are not [an RFC] assessment but are used to rate the severity of mental impairments at steps 2 and 3

of the sequential evaluation process. The mental [RFC] assessment used at steps 4
and 5 of the sequential evaluation process requires a more detailed assessment.

The ALJ furthered that the RFC assessment that he reached at Step Four "reflects the degree of
limitation [that he] has found in the 'paragraph B' mental functional analysis."

40.     While the ALJ's finding of a mild impairment of the third domain (concentration,
persistence, and pace) functioning does carry over to the RFC assessment, other factors go into
the RFC assessment, too. Consequently the RFC assessment and the Step Four analysis behind it
contain additional reasons for why the ALJ found no concentration-related impairment severe
enough to preclude the Plaintiff's ability to perform simple and unskilled work. The ALJ's full
Step Four reasoning enjoys evidentiary support, moreover, regardless of whether the Step Two
finding should have been for a mild or moderate degree of impairment of third domain
(concentration, persistence, and pace) functioning.

41.     As for the advisors' RFC ratings, they are relevant items of record in their own
right and properly part of the more comprehensive Step Four analysis. Indeed the ALJ gave them
overall great evidentiary weight. However their reports are not determinative by themselves. As
the Commissioner explains at SSR 96-6p, the medical opinions of those who lack a treating
relationship with the claimant is subject to stricter scrutiny. For that same reason the opinions of
agency advisors who do not even examine the claimant "can be given weight only insofar as they
are supported by evidence in the case record". As the Eleventh Circuit stresses in its Schink
opinion at page *8, less weight is given to the medical opinion of a non-examining source and
little weight if it is contradicted by the opinion of a treating or examining source. Nor does an
agency advisor's opinion bind the ALJ. Applying SSR 96-6p here highlights how as non-treating
(and non-examining) sources, Dr. Jackson and Dr. Pack are entitled to less deference. They

reached their opinions solely from reviewing records---and only those records that had been obtained up to that point in time. Secondly, their RFC ratings must be weighed against the rest of the record. The evidentiary record, when considered on the whole, does not corroborate the Plaintiff's allegation of a concentration-related impairment of a disabling or even substantial degree. For example neither Dr. Sassatelli nor Mr. Delong who both evaluated the Plaintiff firsthand saw a disabling degree of impairment, and the medical record shows substantial improvement with the benefit of treatment compliance and sobriety. Indeed the Plaintiff actively was receiving vocational training in anticipation of her transition to her preferred new line of work.

42. Thirdly, as the Commissioner emphasizes in his Response, the ALJ did not give great evidentiary weight and did not otherwise defer to the advisors' opinion of moderate concentration impairment, specifically. Instead the ALJ gave weight to the advisors' opinion that the Plaintiff can perform the various mental demands (including concentration) needed for simple, routine, and unskilled work even if the Plaintiff has some difficulty with detailed tasks, detailed instructions, or sustained attention. Those parts of the advisory RFC ratings to which the ALJ gave great weight therefore support, rather than contradict, the ALJ's threshold PRT findings as well as the ALJ's later RFC assessment and vocational findings. It is the advisors' substantive explanation that is most important to the disability analysis, anyway, see Jones v. Comm'r, 478 Fed.Appx. 610 (11th Cir. 2012), and that is the part to which the ALJ gave weight.

43. The Plaintiff argues next that the ALJ failed to account for a moderate concentration impairment in the concluding vocational analysis. The Plaintiff thereby frames her objection in Winschel terms. An ALJ had found Mr. Winschel to have moderate limitation in maintaining concentration, persistence, and pace at Step Two of the analysis but did not account

for how that PRT finding affected Mr. Winschel's ability to work at Step Five of the analysis. See Winschel v. Comm'r, 631 F.3d 1176, 1181 (11th Cir. 2011). Technically speaking, the Plaintiff's Winschel-based objection is distinguishable. The ALJ found her to have a mild, not moderate, degree of impairment. Nevertheless this Court still finds an adequate link between the ALJ's PRT findings at Step Two and the RFC and vocational findings at Steps Four and Five to satisfy Winschel's general concerns.

44.    The ALJ translated the Plaintiff's mental impairments into vocational terms when he limited her to simple instructions, simple work-related decision-making, and being off-task 10% of the workday. The ALJ thereby made substantial accommodation for mental impairment including for impaired concentration. For the reasons this Court explains elsewhere herein, the RFC that the ALJ assessed enjoys the support of competent, substantial evidence. While there is evidence of mental health conditions and of impairments that they cause, there is insufficient evidence of a disabling degree of impairment, especially during periods of mental health treatment compliance and sobriety.

45.    Next there is the ALJ's finding of jobs in the general economy that the Plaintiff can do despite her impairments. To begin with, this Court finds that the ALJ complied with Social Security regulations and case law for making the determination. Eleventh Circuit case law requires the vocational hypothetical to be complete and to account for all impairments including the PRT findings. See Winschel, 631 F.3d at 1180—81. There are two ways to comply. The first option is for the ALJ to include the PRT limitations in the vocational hypothetical proffered to the Vocational Expert. See also, Duval v. Comm'r, 628 Fed.Appx. 703 (11th Cir. 2015). Strictly speaking, the ALJ did not do that here: he did not directly and expressly include a mild concentration impairment in the hypothetical that he proposed to the VE. However the ALJ did

include in the hypothetical that the Plaintiff would be off-task 10% of the workday which implicitly accounts for the Plaintiff's concentration impairment. Moreover the VE classified the identified jobs as "SVP 2 positions", which, as the Eleventh Circuit holds in Chambers, below, is consistent with the demands of simple and unskilled work. To that extent, therefore, the vocational analysis does account for the PRT finding of a mild concentration impairment.

46.     The second means of compliance is if the ALJ's analysis reveals---even if implicitly---some evidentiary basis for finding that the Plaintiff can perform the RFC as assessed despite the PRT limitations. The ALJ implicitly did so here. The ALJ's overall analysis offers a sufficient evidentiary basis for finding that the Plaintiff can perform the RFC as assessed despite the PRT concentration limitation finding. "In summary," the ALJ concluded at page 34 of the Administrative Record, "the totality of the evidence fails to support limitations beyond those set forth in the [RFC]." The ALJ thereby complied with Winschel. See Testoni v. Comm'r, 2019 WL 3812487 (M.D.Fla. 2019) (citing Mijenes v. Comm'r, 687 Fed.Appx. 842 (11th Cir. 2017)) and Anderson v. Berryhill, 2018 WL 4039354, *9 (S.D.Fla. 2018) (finding no reversible Winschel error where the ALJ implicitly accounted for the PRT findings in the vocational analysis).

   **(2)     Whether the ALJ Improperly Considered the Plaintiff's Mental Processing Speed.**

47.     Underlying the Plaintiff's second objection is the 71 "Processing Speed" score from the Wechsler Adult Intelligence Scale (WAIS-IV) test that Dr. Sassatelli had administered as part of his evaluation of the Plaintiff. The Processing Speed Index, Dr. Sassatelli explains in his report (at page 318 of the Administrative Record), measures one's "ability to accurately process visual information without making errors under timed conditions." As Dr. Sassetelli

ranked it, the Plaintiff's score of 71 "falls within the low borderline range" and indicates "overall processing speed abilities [that are] equal to or greater than 3% of individuals within her age range." Of the four WAIS-IV subtests that Dr. Sassatelli had administered[2], the Processing Speed subtest yielded the lowest score.

48.     The Plaintiff included the Processing Speed score in a hypothetical to the VE. The VE explained that if the hypothetical worker's processing speed and focus is less than the 86th percentile of the average worker, then, as a general rule, that worker is unable to work in a sufficiently timely fashion to be employable. When asked if the 71 WAIS processing speed is less than the 86th percentile, the VE answered, "Well, that really doesn't, it can be one processing speed. Does that really equate to more production? So, I'm just telling you where the threshold is." It is unclear, therefore, whether the VE answered the question in the affirmative or negative. Instead the VE emphasized how at the minimum a worker must be able to spend 85% of a two hour time period on-task and performing work functions to be employable. Neither the ALJ nor the Plaintiff asked any further questions about it. (That exchange is found at pages 60—61 of the Administrative Record.)

49.     Nor did the ALJ expressly address in the written decision either the 71 WAIS Processing Speed score or the 86th percentile on-task minimum requirement. The Plaintiff argues that the ALJ thereby erred. The Plaintiff's present argument rests on the assumption that her 71 WAIS Processing Speed score in fact does fall below the 86th percentile and thus would

---

[2] Regarding the other three subtests, the Plaintiff's Verbal Comprehension score was 93 (within the average range). Her Perceptual Reasoning score was 82 (within the low average range), and her Working Memory score was 83 (within the low average range). Altogether the four subtests yielded a Full Scale IQ score of 79 which falls within the borderline range, Dr. Sassatelli concluded.

be considered generally incompatible with work ability. The Plaintiff's argument therefore implies that her 71 WAIS Processing Speed score is a material point. From that, the Plaintiff argues that the ALJ's failure to address it means that the decision lacks the support of competent substantial evidence. This Court disagrees and sees no reversible error.

50.     While the ALJ may not have mentioned the Processing Speed subtest score specifically in the decision, the ALJ did discuss the Plaintiff's overall IQ score (of which the Processing Speed subtest score is part). "The record shows the claimant has a FSIQ of 79", the ALJ observed at Step Three of the disability analysis. The ALJ also discussed Dr. Sassatelli's report, generally.

51.     Even if a Processing Speed subtest score of 71 is generally insufficient to permit sustained work activity, the score does not necessarily compel a finding of disabled here in this case. Other facets of Dr. Sassatelli's report show greater functional ability than what that particular subtest score alone suggests. To the contrary, his report shows a general ability to work. As the ALJ noted, the Plaintiff responded to all of Dr. Sassatelli's inquiries in a forthright manner, maintained attention and concentration at all times, and completed all evaluative procedures. Dr. Sassatelli anticipated the Plaintiff's return to employment after her mental and emotional conditions had stabilized, the ALJ added. The rest of the record likewise shows greater work ability than what that particular subtest score suggests. Dr. Delong anticipated the Plaintiff's return to full-time employment and saw sufficient mental capacity to perform the mental demands of unskilled work, the ALJ noted. The treatment notes from the Tri-County clinic show substantial mental health, cognitive, and emotional improvement with the benefit of treatment and sobriety, the ALJ added.

52.     Furthermore the ALJ acknowledged the presence of a cognitive impairment when he found "borderline intellectual functioning with a full-scale intelligence quotient" to be a severe impairment at Step Two of the disability analysis. After considering the evidence, the ALJ translated that (and the Plaintiff's other mental health impairments) into vocational terms when the ALJ limited her to simple and unskilled work. In other words the ALJ found the Plaintiff's intellectual (and other mental conditions) to pose limitations but not to be so impairing as to preclude all work.

53.     Competent, substantial evidence supports the ALJ's findings. The Plaintiff's treating provider at the Tri-County clinic expressly disagreed with the IQ rating that Dr. Sassatelli had given as too low based on the provider's own experience with and observations of the Plaintiff over time. When he conducted his vocational evaluation, Mr. Delong observed resistance to completing testing tasks implying less than full effort by the Plaintiff. Mr. Delong also observed the Plaintiff to have poor focus, but he attributed it to anxiety and thus not to some cognitive or IQ defect. Not only did both Dr. Sassatelli and Mr. Delong anticipate the Plaintiff's return to employment, but she actively participated in vocational services.

**(3)     Whether the ALJ Failed to Resolve a Conflict Between the Vocational Expert and the DOT.**

54.     Thirdly, the Plaintiff argues that the ALJ failed to resolve a conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT"), as SSR 00-4p required the ALJ to do. At the Administrative Hearing the ALJ proposed a hypothetical worker who "is able to understand, carry out, and remember simple instructions", who can "make simple work-related decisions", and who "would be off task 10% of the work day." The VE answered that such a worker could perform the jobs of laundry worker (DOT No. 361.685-018), janitor (DOT

20 of 28

No. 381.687-018), and store laborer (DOT No. 922.687-058). Those jobs, the VE furthered, are unskilled and have a "specific vocational preparation time ("SVP")[3] of 2. Lastly the VE affirmed that her testimony is consistent with what the DOT says.

55.     Although the VE said there is none, the Plaintiff now argues that a conflict---or at least an <u>apparent</u> conflict---does exist between the VE's testimony and the DOT. The DOT rates all three jobs as having a Reasoning level of 2. Level 2 Reasoning, as the DOT defines it[4], might entail cognitive functional ability that is greater than what someone who is limited to simple or unskilled work can do, the Plaintiff proposes. The ALJ therefore should have flushed that potential conflict out (even if the Plaintiff, herself, made no issue of it at the administrative hearing) and resolved it before concluding that she can perform the identified jobs. The Plaintiff therefore seeks to remand the case back to ALJ for consideration of that point and if need be for resolution of any conflict that exists.

56.     The Plaintiff relies on <u>Washington v. Comm'r</u>, 906 F.3d 1353 (11th Cir. 2018) and its interpretation of SSR 00-4p that imposes upon the ALJ the affirmative and independent duty to take notice of any apparent VE—DOT conflict and, if one is present, to resolve that conflict. The Eleventh Circuit rendered its <u>Washington</u> opinion on October 29, 2018 and thus after the ALJ had rendered his decision (on December 15, 2017). When the ALJ rendered his decision on the Plaintiff's application, then binding Eleventh Circuit case law allowed him to

---

[3] A job with an SVP of 2 requires anything beyond a short demonstration up to and including one month of time to learn the techniques, acquire the information, and develop the facility needed for average job performance. <u>See</u> Appendix C of the DOT.

[4] A job with a Reasoning level of 2 requires the ability to handle commonsense problems involving a few concrete variables in or from standardized situations. <u>See</u> Appendix C of the DOT.

resolve such conflicts by relying solely on the VE's testimony, see Jones v. Apfel, 190 F.3d 1224 (11th Cir. 1999), which is what the ALJ did. Before Washington, the Eleventh Circuit permitted an ALJ to rely on the VE to answer the question of whether a conflict existed, and if there was a conflict, the Eleventh Circuit favored the VE's testimony over the DOT. Because this Court sees in the case law no bar to Washington's retroactive application to the Plaintiff's case, this Court proceeds to consider whether the ALJ fell short of his SSR 00-4p obligation as Washington subsequently interpreted it.

57.     The first question is whether the ALJ failed to identify an apparent conflict between the VE's testimony and the DOT. Washington defines the term "apparent conflict" broadly:

> It is a conflict that is reasonably ascertainable or evident from a review of the DOT and the VE's testimony. At a minimum, a conflict is apparent if a reasonable comparison of the DOT with the VE's testimony suggests that there is a discrepancy, even if, after further investigation, that turns out not to be the case.

Id. at 1365. Washington "take[s] the word 'apparent' to mean 'seeming real or true, but not necessarily so." Id. at 1366. However there still must be some sort of conflict to trigger an ALJ's SSR 00-4p duty of inquiry and resolution. If there is no conflict---neither real nor apparent---then there is nothing for the ALJ to address. Or, as Washington furthers, an SSR 00-4p error is harmless if "no conflict in fact existed", and a harmless SSR 00-4p error does not warrant a remand. Id. at 1366.

58.     It is settled in the Eleventh Circuit that the Reasoning levels of 2 and 3 are consistent with the ability to do unskilled or simple work if the SVP is a 2. See Chambers v. Comm'r, 662 Fed.Appx. 869 (11th Cir. 2016), Leigh v. Comm'r, 496 Fed.Appx. 973 (11th Cir. 2012), and Hurtado v. Comm'r, 425 Fed.Appx. 793 (11th Cir. 2011). See also, Carter v.

Comm'r, 2017 WL 9362495, *9 (M.D.Fla. 2017) (following Chambers to find no conflict between the VE's testimony that a person limited to simple and unskilled work can do jobs which the DOT rates with a Reasoning level of 3 and an SVP of 2). In its Response to the Plaintiff's Motion for Summary Judgment, the Commissioner relies on Chambers to support his contention "that there is no apparent conflict" present in this case. The DOT classifies the jobs that the VE identified as having a Reasoning level of 2 and an SVP of 2, and that DOT classification is compatible with unskilled work and simple tasks under Chambers. The Plaintiff filed no Reply to counter the Commissioner's Chambers-based explanation.

59.     In Chambers the Eleventh Circuit rejected the same SSR 00-4p objection that the Plaintiff raises here in this case for two different reasons. "First, there was no apparent inconsistency". "Second," the Eleventh Circuit added, "even if there was a conflict between the DOT and the jobs identified by the vocational expert in response to the hypothetical question, the testimony of the vocational expert outweighs the DOT". Id. at 873. The Eleventh Circuit based that second reason on its then binding Jones opinion. Because Washington abrogates Jones, it also abrogates Chambers to the extent it relies on Jones for its second reason. However Washington does not address at all the first reason that Chambers gives for finding no SSR 00-4p error. Presumably, therefore, the first reason that Chambers gives for denying remand remains valid law.

60.     Only three cases address this same question about whether Chambers survives Washington. All three were decided at the district court level, and thus have no binding effect. The most recently decided of these three cases is Vanwinkle v. Saul, 2019 WL 3562129 (S.D.Ga. 2019). In that case the ALJ found Ms. Vanwinkle capable of performing simple, routine, and repetitive tasks. The district court found no conflict between the VE's testimony that that RFC

permits Ms. Vanwinkle to perform the identified unskilled jobs and the DOT's classification of those jobs with a Reasoning level of 2. The district court characterized Ms. Vanwinkle's SSR 00-4p objection as a "red herring". "In the Eleventh Circuit," the district court explained, "a limitation to simple, routine work does not preclude performance of jobs as high as a GED reasoning code 3." In support thereof it cited Chambers as establishing that a job with a reasoning level of 3 and an SVP of 2 requires, at a maximum, one month of time to learn the techniques, acquire the information, and develop the facility for average job performance. That makes the job consistent with unskilled work, with little or no judgment needed to do simple duties. The Vanwinkle court cited Washington as overruling Chambers "on other grounds". Id. at *7. This Court agrees with Vanwinkle that Washington invalidates only the second basis for Chambers' holding.

61. The other two decisions, Schoenradt v. Berryhill, 2019 WL 851417 (M.D.Fla. 2019) and Borroto v. Comm'r, 2019 WL 488327 (M.D.Fla. 2019), granted remand despite Chambers and sent the matter back to the ALJ to consider whether claimants who are limited to simple work can perform jobs with a reasoning level of 2 or 3. Washington, rather than Chambers, controlled the outcome of those two decisions. Borroto disregarded Chambers as a "post hoc" resolution of a conflict that "now [is] impermissible under Washington" and as a "now-defunct legal proposition[]." Id. at *10. Schoenradt relied on Washington's broad definition of "apparent conflict", and it also regarded "the issue of whether VE testimony that a claimant limited to simple, routine, repetitive tasks can perform work requiring reasoning level of 3 conflicts with the DOT" as one that "remains unsettled" after Washington. Id. at p. *5. This Court finds neither Borroto nor Schoenradt to be persuasive authority and does not follow them to direct a remand in this case.

62.     It might be that <u>Borroto</u> and <u>Schoenradt</u> extend <u>Washington</u> too far. To begin

with, <u>Washington</u> is distinguishable on its facts. <u>Washington</u> addresses an entirely different

VE—DOT conflict than <u>Chambers</u>. In <u>Washington</u>, the VE testified that the claimant can do the

jobs of table worker and bagger despite his limitation to occasional fine manipulation. However

the DOT defines those jobs as requiring frequent fine manipulation. That "was an apparent---

indeed glaring---conflict", the Eleventh Circuit concluded at page 1366. <u>Washington</u> therefore

addresses a physical job requirement whereas <u>Chambers</u> (and the Plaintiff's case at bar)

discusses a mental (reasoning) job requirement. Second, with regard to its legal analysis,

<u>Washington</u> did not consider the situation where binding precedent already has resolved the

matter and found no actual conflict to exist.

63.     Nor does this Court find other applications of <u>Washington</u> persuasive as to

whether remand is warranted in this case. <u>See</u>, <u>e.g.</u>, <u>Johnson v. Comm'r</u>, 2019 WL 3453229

(11th Cir. 2019). They are unpersuasive because they neither include <u>Chambers</u> in their legal

analyses nor expressly address the situation of prior binding case law that found no conflict. For

the same reason this Court finds its own previously rendered decision of <u>Cullum v. Berryhill</u>,

Case No. 18-14001-CIV-ROSENBERG (Report and Recommendation dated Dec. 4, 2018 and

docketed at DE 29), not to control here. That decision was based on <u>Washington</u> alone whereas

in this case <u>Chambers</u> also is at issue.

64.     This Court therefore overrules the Plaintiff's SSR 00-4p objection. Regardless of

whether the ALJ ideally <u>should</u> have expressly identified and then resolved the issue of whether

the Plaintiff can perform the identified jobs despite the Reasoning level that the DOT gives them,

<u>Chambers</u> (and its preexisting Eleventh Circuit case law) already established that no actual

conflict exists between a Reasoning Level of 2 or 3 and the ability to do simple or unskilled

work. Because binding Eleventh Circuit case law already has addressed that apparent conflict and already has resolved it by finding no actual conflict, there was no conflict to trigger the SSR 00-4p obligation to do so in the Plaintiff's case. Moreover SSR 00-4p, itself, expressly says that a person limited to unskilled work can do jobs with an SVP of 2. To the extent the ALJ should have undertaken that SSR 00-4p inquiry nonetheless, that error was harmless and does not warrant a remand.

## CONCLUSION

65.     The Plaintiff's present objections to the ALJ's decision concern those aspects of the record and vocational analysis that concern cognitive and intellectual functioning. However the Plaintiff did not claim disability due to that kind of impairment. The Plaintiff claimed disability due to bipolar disorder and more specifically to the initial (and primary) impairing effects of manic episodes and later the (secondary) impairing effects of lingering depression. In other words the Plaintiff's disability claim concerns impairments caused by emotional instability, not cognitive or intellectual deficiency. See generally, Schink, supra, at *9 (likewise observing how the focus of the disability claim concerned how the claimant's bipolar disorder impaired his mood, affect, and interpersonal relationships rather than his ability to understand and remember.) The treatment record shows that her emotional stability improves with the benefit of treatment and sobriety. To the extent cognitive or intellectual-type impairments have been found, they have been attributed to non-medical causes. At different points in the treatment record, such problems are attributed to the lingering effects of past substance abuse or as a side-effect of medication (that was resolved by a medication change). Nevertheless the ALJ made substantial accommodation for mental health impairments. Where the ALJ departed from the Plaintiff's

allegation was over whether her mental health conditions are fully disabling. Rather than wholly disabled, the ALJ found that the Plaintiff still retained sufficient minimum capacity for work.

66.     It is not for this Court upon judicial review to re-weigh the evidence or to reach its own findings of fact anew. Social Security law does not permit this Court to make its own decision about the Plaintiff's disability application. That is the responsibility of the ALJ as the fact-finder in this case, to whom Social Security law requires deference. Judicial review therefore is limited to ensuring that the ALJ's findings of fact are supported by competent, substantial evidence. Judicial review also entails ensuring that the decision comports with the governing law and regulations. Having reviewed the parties' arguments and having independently and carefully reviewed the whole record, this Court finds the decision to enjoy evidentiary support and to be consistent with governing law. Consequently this Court sees no grounds warranting reversal or remand.

It is therefore,

**ORDERED AND ADJUDGED** that the Plaintiff's Motion for Summary Judgment (DE 17) is **DENIED.** Seeing no grounds warranting reversal or remand, this Court **AFFIRMS** the Commissioner's decision, and this Court therefore **GRANTS** the Defendant's Motion for Summary Judgment (DE 16).

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this ___9ᵗʰ___ day of

September, 2019.

SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE